UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Criminal No. 07-107 (PLF) |
| : | |
| MICHAEL C. IRVING, : | |
| : | |
| Defendant. : | |
| : | |

## GOVERNMENT'S SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE COUNT SIX OF THE INDICTMENT

Comes now the United States of America, by and through undersigned counsel, and hereby opposes defendant's Motion To Strike Count Six. Defendant's claim lacks merit and thus should be summarily rejected. In support of this opposition, the government submits the following:

### FACTUAL BACKGROUND

On April 24, 2007, a duly impaneled grand jury in the United States District Court for the District of Columbia returned an indictment charging defendant with two counts of filing false claims, three counts of federal income tax evasion, one count of fraud in the first degree in violation of D.C. Code, and three counts of D.C. income tax evasion. These charges stem from defendant's affirmative attempts to evade his federal and local income taxes for the calendar years 2002 through 2005, as well as his fraudulent attempts to obtain money from the federal government and the District of Columbia ("D.C.").

Defendant, a police officer with Metropolitan Police Department ("MPD") and citizen of Washington, D.C., earned wages from MPD. Throughout his years of employment, prior to the prosecution period, defendant filed timely tax returns and paid taxes. In November 2002, defendant caused to be submitted to MPD false federal and D.C. withholding certificates, Forms W-4 and D-4, in which he claimed he was "exempt" from income tax withholding. In April 2003, defendant filed with D.C. a false income tax return for the 2002 tax year, which reported no wages and demanded a payment of $10,534. He also filed a statement alleging that he did not earn income and was not required to file tax returns.

In June 2003, the D.C. Office of Tax and Revenue ("OTR") issued a "Notice of Correction and Tax Bill" informing defendant that his 2002 return, which reported no wages, was false and that he needed to resolve his 2002 tax liabilities. In response, defendant filed false trust tax returns (Forms D-41, D.C. Fiduciary Income Tax Returns) for tax years 2000 through 2002. In these filings, defendant alleged that his wages from MPD were income to the "trust," and he sought payment from the government in the amount of withholdings for each year.

Both OTR and the IRS continued to contact defendant and advise him that his filings were illegal and inaccurate. Defendant, however, ignored those contacts and continued to cause to be submitted false "exempt" withholding forms, in December 2003 and again in January 2004. Defendant did not file his 2003, 2004, or 2005 federal or D.C. income tax returns.

It was only after defendant was informed by certified letter from the IRS of their intent to levy his bank accounts to obtain taxes owed that defendant contacted his former tax return preparer and filed federal and D.C. tax returns for 2002. Notably, defendant reported his MPD wages of $155,211 as taxable income. The 2002 returns were filed in December 2004.

Immediately thereafter, in January 2005, defendant caused another false withholding form to be filed with MPD.

In Count Six of the indictment, defendant is charged with violation of Fraud in the First Degree. Count Six alleges:

> Beginning on or about January 1, 2002, and continuing through on or about September 29, 2003, in the District of Columbia and elsewhere, MICHAEL C. IRVING, a resident of the District of Columbia, engaged in a scheme and systematic course of conduct with the intent to defraud the District of Columbia and to obtain for MICHAEL C. IRVING property of the District of Columbia by means of false and fraudulent pretense, representations and promises, and thereby obtained property of the District of Columbia and caused the District of Columbia to lose property, consisting of District of Columbia income taxes required by law to be paid by MICHAEL C. IRVING, in the approximate value of more than $250, by committing the following acts, including but not limited to:
>
> a)  filing and causing to be filed false and fraudulent Forms W-4 and D-4 with MPD, in which he falsely claimed he was "exempt" from withholdings;
> b)  filing and causing to be filed a false claim for refund in the amount of $12,490, to wit: 2000 Fiduciary Income Tax Return;
> c)  filing and causing to be filed a false claim for refund in the amount of $12,523, to wit: 2001 Fiduciary Income Tax Return;
> d)  filing and causing to be filed a false claim for refund in the amount of $10,534, to wit: 2002 Fiduciary Income Tax Return;
> e)  filing and causing to be filed a false claim for refund in the amount of $10,534, to wit: 2002 District of Columbia Individual Income Tax Return which falsely reported his total income was $0.

In violation of Title 22, District of Columbia Code, Section 3221(a).

**ARGUMENT**

**I. "Property" includes the District of Columbia's right to receive payment for taxes for the purposes of the D.C. Fraud Statute (D.C. Code § 22-3221).**

Defendant, in his argument, invites this Court to define "property" narrowly, only as a *thing* that can be *taken* from someone else, limiting fraud to times when one party snatches something from the hands of another. Defendant also argues that because the D.C. government never had defendant's unpaid taxes in its treasury, he has not obtained property from the District or caused it to lose property. Under the plain meaning of the statute, as supported by the legislative history and the case law, defendant's contentions are incorrect.

Under D.C. Code § 22-3221 ("D.C. Fraud Statute"),

> [a] person commits the offense of fraud in the first degree if that person engages in a scheme or systematic course of conduct with intent to defraud or to obtain property of another by means of a false or fraudulent pretense, representation, or promise and thereby obtains property of another or causes another to lose property.

The concept of "property" under the D.C. Fraud Statute is more broad and complex than defendant suggests. For the purposes of § 22-3221, property means "*anything of value*." D.C. Code § 22-3201(3) (emphasis added). The listed examples of: real property, personal property, and services are not an exclusive list of the items that are considered "property" for purposes of fraud. Furthermore, "property of another" is "*any property in which a government* or a person other than the accused has an interest which the *accused is not privileged to interfere with or infringe upon* without consent." D.C. Code § 22-3201(4) (emphasis added).

To analyze this statutory language, it is necessary "to read the language of the statute and construe its words according to their ordinary sense and plain meaning." Hospitality Temps Corp. v. District of Columbia, 926 A.2d 131, 136 (D.C. 2007) (internal quotations omitted). The

definition of property as "anything of value" under D.C. Code §§ 22-3221 and 22-3201 is quite broad, which comports with traditional notions of "property." "[T]he term 'property' . . . extends to every species of right and interest capable of being enjoyed as one upon which it is practicable to place a money value." 63C Am. Jur. 2d Property § 4. The government's right to income tax payments–and the obligation of taxpayers to make these payments–is not an abstract concept. Instead, the taxpayer's obligation to pay and D.C.'s right to receive payment are themselves property. 73 C.J.S. Property § 8 (2007). This broad definition of property is reflected in the D.C. Criminal Jury Instructions: "'[a]nything of value includes things possessing intrinsic value, and also bank notes, other forms of paper money, commercial paper, and other writings that represent value." 1-1 Criminal Jury Instructions for D.C. Form Instruction 3.09. Furthermore, D.C. Courts have repeatedly applied the D.C. Fraud Statute to tax crimes. See, e.g., United States v. Lloyd, 71 F.3d 408, 409 (D.C. Cir. 1996)); United States v. Ponds, 290 F.Supp.2d 71, 72 (D.D.C. 2003), rev'd on other grounds, 454 F.3d 313 (D.C. Cir. 2006); United States v. Harris, 2006 U.S. Dist. LEXIS 73220, 98 A.F.T.R.2d (RIA) 7252 (D.D.C. 2006).[1]

Contrary to the defendant's contention that property must be something that is actually in the hands of another and then taken away, "'property' refers not to a particular material object but to the right and interest in an object." 63C Am. Jur. 2d Property §1 (2007). Indeed, "[i]n its

---

[1] Tax preparer Charles Lloyd was convicted of first-degree fraud under the D.C. Fraud Statute for causing a false income tax return to be filed in D.C.. United States v. Lloyd, 71 F.3d 408, 409 (D.C. Cir. 1996). Navron Ponds was convicted under the D.C. Fraud Statute, *inter alia*, of fraud "relat[ed] to a multi-year scheme involving the non-payment of personal income taxes." United States v. Ponds, 290 F.Supp.2d 71, 72 (D.D.C. 2003). Finally, taxpayer Cassandra Harris was charged with four counts of federal felony tax evasion and first-degree fraud under the D.C. Code, and the court upheld her indictment. United States v. Harris, 2006 U.S. Dist. LEXIS 73220, 98 A.F.T.R.2d (RIA) 7252, *9-10 (D.D.C. 2006).

precise legal sense, property is nothing more than a collection of rights." Id. In failing to pay his income taxes and in obstructing the proper income tax withholding process through his filing false exempt Forms D-40, defendant took this right from D.C., caused D.C. to lose funds from its treasury, and obtained funds for himself.

**II.  Other courts–including the Supreme Court–have held that the right to collect taxes is "property" and that refusing to pay taxes constitutes obtaining property from the government.**

A conclusion that the right to receive taxes is "property" is also mandated by the United States Supreme Court and other appellate courts. In Pasquantino v. United States, 544 U.S. 349, 353 (2005), the defendants were convicted of wire fraud for smuggling liquor into Canada without paying Canada's import taxes. Among other claims, the defendants argued that "Canada's right to collect taxes from them was not 'money or property' within the meaning of the wire fraud statute." Id. at 354. This argument was summarily rejected by the Supreme Court, as well as in panel and *en banc* decisions by the Fourth Circuit. Id. at 354-55.

The legal claim in Pasquantino bears obvious resemblance to defendant's claim that D.C.'s right to collect taxes is not "property" under the D.C. Fraud Statute. However, there are other reasons to apply the Pasquantino reasoning to the situation at hand. First, the wire fraud statute employs language that is similar to the D.C. Fraud Statute by criminalizing wire communication for "devis[ing] or intending to devise any scheme or artifice to defraud, or for *obtaining money or property* by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343 (emphasis added). The focus of the wire fraud statute on property that can be "obtained" is similar to the D.C. Fraud Statute's requirement that the defendant "obtains property of another or causes another to lose property." D.C. Code § 22-3221. Notably, according to the legislative history of the D.C. Fraud Statute, it was based upon the federal mail

- 6 -

fraud statute.[2] The Supreme Court pointed out that it has "construed identical language in the wire and mail fraud statutes *in pari materia* [on the same matter or subject]." Id. at 355 n.2. See also Fountain v. United States, 357 F.3d 250, 253 (2d Cir. 2004). Thus, the Pasquantino court's analysis is especially useful in the instant case.

In Pasquantino, the Canadian government's right to collect taxes on imported liquor was "an entitlement to collect money" and "something of value." Id. at 355 (internal quotations omitted). "Valuable entitlements like these are 'property' as that term ordinarily is employed." Id. at 356. And, **"[t]he right to be paid money has long been thought to be a species of property."** Id. (citing 3 W. Blackstone, Commentaries on the Law of England 153-155 (1768)). There is an "economic equivalence between money in hand and money legally due," and the Pasquantino **defendants' refusal to pay taxes "inflict[ed] an economic injury *no less than had they embezzled funds* from the Canadian treasury."** Id. (emphasis added). Similarly, there is no difference between defendant's complete refusal to pay the income tax due to D.C. and illegally taking money that is already in the city treasury. In Pasquantino, the Supreme Court "decline[d] to interpret [the wire fraud] statute more narrowly that it [was] written." Id. at 359 (internal quotations omitted). Similarly, the D.C. Council clearly intended for the Theft and White Collar Crimes Act to be interpreted broadly, and accordingly this court should reject the defendants' suggested narrow interpretation of the D.C. Fraud Statute.

The Supreme Court's conclusion in Pasquantino was foreshadowed decades earlier in Manning v. Seeley Tube & Box Co., 338 U.S. 561 (1950). In that case, the IRS assessed the

---

[2] See David Clarke (Chairperson, Committee on the Judiciary), Extension of Comments on Bill No. 4-133: The District of Columbia Theft and White Collar Crimes Act of 1982 (July 20, 1982) at 41.

taxpayer corporation with deficiencies in its tax payments, plus interest. Id. at 562-63. In a subsequent year, the corporation had a net operating loss, which was carried back and abated the previously assessed deficiencies. Id. at 564. The taxpayer claimed a refund of the interest paid on the deficient payments, but the Commissioner refused to issue the refund. Id.

The Supreme Court supported the Commissioner's position because during the delinquent period "the taxpayer had a positive obligation to the United States: a duty to pay its tax. For that period *the taxpayer, by its failure to pay the taxes owed* **had the use of funds which rightfully should have been in the possession of the United States**." Id. at 565-66 (internal citations omitted) (emphasis added). Similar to the tax collection scheme in D.C., discussed *infra* in § IV, "Congress intended the United States to have the use of the money lawfully due when it became due," and the government had the right to use those payments during the period in which the taxpayer owed the tax payments. Id. at 566. The court rejected the defendant's position because it would be absurd to allow a *delinquent taxpayer* to "receive the full use of the tax funds for the intervening period" while the *government* had the use of taxes paid on time by *law-abiding* taxpayers. Id. at 568.

Prior to the Supreme Court's decision in Pasquantino, a number of circuit courts concluded that the right to collect taxes is property. For example, in Fountain v. United States, 357 F.3d 250, 257 (2004), the Second Circuit concluded that **"taxes owed to the government–*even if not yet collected*–are property in the hands of the government."** (Emphasis added). In Fountain, a retired police officer engaged in a scheme to import cigarettes into Canada without paying the high Canadian taxes on tobacco products. Id. at 252. Defendant Fountain was convicted of money laundering, and the "illegality of the underlying conduct derived from the wire fraud statute." Id. at 252-53. Fountain claimed that he could not be

convicted for defrauding the Canadian government because its right to collect taxes was not property in the government's hands when the fraud was committed. Id. Fountain's erroneous claim is similar to defendant's claim that illegally refusing to pay taxes to D.C. does not involve "obtain[ing] property of another or caus[ing] another to lose property." The Second Circuit rejected Fountain's argument and concluded that "**taxes remain property** within the purview of the mail and wire fraud statutes," regardless of whether they are already in the possession of the government. Id. at 255 (emphasis added). Other circuits also considered this question and determined that "taxes are property in the hands of the government." Id. at 258 (citing United States v. Dale, 991 F.2d 819, 849 (D.C. Cir. 1993); United States v. Helmsley, 941 F.2d 71, 94-95 (2d Cir. 1991); United States v. Bucey, 876 F.2d 1297, 1310 (7th Cir. 1989); United States v. Miller, 545 F.2d 1204, 1216 n.17 (9th Cir. 1976)) (distinguishing United States v. Griffin, 324 F.3d 330 (5th Cir. 2003)).

**III. The legislative history of the D.C. fraud statute supports a broad application of its terms.**

In addition to the plain language of the statute, the legislative history of the District of Columbia Theft and White Collar Crimes Act of 1982 (the source of the D.C. Fraud Statute) ("Act") supports a broad interpretation of the Act's provisions. The District of Columbia Council Members who approved the Act intended to "remov[e] anachronisms and unnecessary technical statutory and common law distinctions which have hampered law enforcement." Council of the District of Columbia Committee on the Judiciary Report on Bill No. 4-133, the "District of Columbia Theft and White Collar Crimes Act of 1982" (June 1, 1982) ("Judiciary Committee Report") at 1. Although the Council did not directly address the issue of tax fraud, it clearly meant to overcome hair-splitting distinctions in favor of a "generalized statute which

prohibits schemes to defraud." Judiciary Committee Report at 4. The statute was intended to combat all types of fraud. David Clarke (Chairperson, Committee on the Judiciary), Extension of Comments on Bill No. 4-133: The District of Columbia Theft and White Collar Crimes Act of 1982 (July 20, 1982) at 41 ("Extended Comments").

Furthermore, "[t]he definition of the term 'property' [as 'anything of value'] is intended to be **broadly construed to insure that *all forms* of property are protected** from unauthorized takings or uses." Extended Comments at 2 (emphasis added). **"[T]he term 'property' includes intangible property of *all types*. Examples of the different kinds of intangible property covered by the term are money, rights, privileges, interests and claims . . . ."** Id. at 2-3 (emphasis added). It is clear that the Act is intended to protect D.C.'s right to collect tax payments, particularly since "[t]he term 'property of another' also includes property of a government." Extended Comments at 3.

The claim urged on this Court by the defendant is inconsistent with the obvious intent of the authors of the Act and with the overall spirit of the Act. The Committee on the Judiciary identified theft and white collar crime as an area "in which legislative action was necessary," especially given "the serious economic and societal costs of theft and white collar crimes." Judiciary Committee Report at 3, 5. For D.C., fraudulent taxpayers create both "serious economic and societal costs" by further straining tight public budgets and draining public coffers of funds to support critical public interests. As a police officer, defendant no doubt recognizes the importance of tax dollars in funding public safety, as well as the constant strain on resources to protect District residents.

Furthermore, to be convicted of fraud in the first degree under the D.C. Fraud Statute, "[i]t is not required that the offender actually profit from the scheme. [It is] sufficient if someone

- 10 -

parts with anything of value because of the scheme." Extended Comments at 42. In this case, defendant profited from the scheme by illegally keeping his income tax-free, and he also caused the D.C. government to part with its right to timely payment of taxes, which is something "of value." Even if defendant paid his tax bill in full today, he deprived the government of the use of those funds during the time they were owed; he "had the use of funds which rightfully should have been in the possession of the [District]." Manning v. Seeley Tube & Box Co., 338 U.S. 561, 565-66 (1950).

**IV. Due to the special nature of the tax system, D.C. had a right to a portion of defendant's income at the time he received the income; by refusing to remit payment to the government, defendant has obtained and caused D.C. to lose this property.**

D.C.'s right to collect taxes is property and is analogous to other entities' rights to payment. However, the government has an even stronger claim to defendant's income taxes than other types of entities to whom people owe money. D.C.'s right to a portion of defendant's income was triggered every time he was paid by the Metropolitan Police Department, or any other employer. It is a cornerstone of the American tax system that taxpayers who earn more than a minimal amount of income are not entitled to have or keep the entire amount of that income. A portion of that income belongs to the government at the time that the wages are paid. This hard lesson is learned by every young American upon receiving her first paycheck, but this rule is critical to the voluntary reporting system in American tax law.

D.C.'s immediate claim on income paid to employees is reflected in its scheme for collecting from employers income taxes that employers withhold from employees' paychecks. In the District of Columbia, employers are required to withhold income taxes in every payroll period and hold those withholdings in trust for the District. D.C. Code § 47-1812.8. These

payments "shall be deemed to be, and shall be, held in trust by the employer for the District of Columbia." D.C. Code § 47-1812.8(f)(1). Employers file either monthly or annual returns reporting their withholding from employees' paychecks. D.C. Mun. Regs., Tit. 9, §§ 132.1, 132.2. With each return filed, employers are required to pay the entire amount withheld during the period of the return–in many cases, every month. D.C. Mun. Regs. Tit. 9, §133.2. Employers who are late in paying these withholdings are charged monthly interest. D.C. Code §47-1812.8(k).

The right to collect taxes from its residents in a timely manner is something that is unquestionably "of value" to the government of D.C. Without timely income tax revenue, the D.C. government would be unable to provide basic services to its residents and fulfill even its most fundamental responsibilities, such as protecting health and safety. Furthermore, it is critical that D.C. has the *right to collect* taxes from its residents because the municipal government is unlikely to survive on charitable donations. Thus, the right is valuable both as a specific means to support common governmental obligations from residents like defendant and also as a necessary tool to *get* that support. As a police officer who receives income from D.C.'s municipal coffers, defendant is well aware of the important role the municipal government plays in the lives of its citizens; the defendant must realize that his salary is funded by tax revenues, which are duly paid by his neighbors and fellow law enforcement officers.

**V.  The defendant's suggested distinction between defendant and people who receive a fraudulent tax refund check is untenable and contradicts the purpose of the statute.**

Defendant claims that he did not "obtain[] property of another or cause[] another to lose property" because the government never had possession of defendant's tax payments. As stated above, the legally required tax payments were the property of the government at the time

defendant was paid; in refusing to pay the government, defendant obtained payments that belonged to D.C. and also caused D.C. to lose those payments–which it rightfully owned. Defendant suggests a distinction between defendant and a person who obtains a fraudulent tax *refund* because this hypothetical person takes something that had actually been in the possession of the government, whereas defendant, it is argued, just maintained control over something the government never had.

This distinction would lead to an anomalous and nonsensical result: 1) defendants who premeditated their crimes, like the case at bar, and schemed to defraud the government early in the tax year (through false exemption from taxes) would *not* be guilty of fraud, whereas 2) defendants who had the proper amount withheld throughout the year and then decided to defraud the government by filing false tax returns *would* be guilty of fraud under the D.C. Code. If a person who commits fraud at the time of filing could be guilty of fraud, it would be unreasonable to free defendant from this liability because he schemed his fraudulent activities at the outset of a tax year.

For these reasons, defendant's Motion to Strike Count Six of the indictment should be denied.

## CONCLUSION

WHEREFORE, the United States moves this Court for an Order denying defendant's Motion to Strike Count Six.

    Respectfully submitted,
    JOHN MORRELLA
    Deputy Assistant Attorney General

    /s/ Karen E. Kelly
    Karen E. Kelly

VA. Bar No. 35403

Michael P. Ben'Ary
VA. Bar No. 46658
Tax Division
601 D. Street, NW
Washington, DC 20530
(202) 616-3864

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Cr. No. 07-107 (PLF) |
| | : | |
| MICHAEL C. IRVING, | : | |
| Defendant. | : | |
| | : | |

_____

**ORDER**

AFTER careful consideration in this case, IT IS HEREBY ORDERED that the defendant's Motion to Strike Count Six is denied.

**SO ORDERED.**

_____
Judge Paul L. Friedman
U.S. District Court for District of Columbia